MICHAEL CLOUGH State Bar No. 235410
Law Offices of Michael Clough
6114 LaSalle Ave, #833
Oakland, CA 94611
Telephone: (650) 274-7764
Facsimile: (888) 285-4128
mwclough@gmail.com

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WATSON ALLISON, | ) Case No.: CV 92-06404 CAS |
|     Petitioner, | ) |
| | ) **DEATH PENALTY CASE** |
|     vs. | ) |
| | ) PETITIONER'S MERITS BRIEF |
| ROBERT AYRES, JR., Warden, | ) |
|     Respondent. | ) |
| | ) |

# TABLE OF CONTENTS

INTRODUCTION                                                                        1

STANDARD OF REVIEW AND BURDEN PROOF                                                 1

EVIDENCE OF WHO SHOT POLK                                                           1

CLAIM 1:   PROSECUTOR SEIFERT'S PRESENTATION OF
EVIDENCE AND ARGUMENT AT ALLISON''S TRIAL THAT
INHERENTLY AND IRRECONCILABLY CONTRADICTED
EVIDENCE AND ARGUMENT AT BONNER'S TRIAL
VIOLATED DUE PROCESS.                                                               2

A.     The Presentation Of Irreconcilably Contradictory Evidence
And Factual Theories At The Separate Trials Of Two Defendants
Violates Long Established Constitutional Rules.                                     2

B.     The Evidence and Argument Presented in Allison's Trial
Irreconcilably Contradicted The Evidence And Argument Presented
In Bonner's Trial On The Critical Material Issue of Whether Bonner
Was In Polk's Apartment                                                             6

C.     Seifert's presentation of evidence and argument violated
Allison's constitutional right to due process.                                     12

D.     Seifert's manipulation of evidence and misconduct in closing
argument was not harmless.                                                          15

INEFFECTIVE ASSISTANCE OF COUNSEL                                                   18

CLAIM 2(B):  Trial Counsel Failed to Discover, Investigate and
Present Exculpatory Evidence                                                        19

Claim 2(A): Trial Counsel Failed To Present Evidence To Chief
Deputy District Attorney Livesay That Would Have Caused The
District Attorney's Office Not To Seek The Death Penalty                            25

i

Claim 2(A): Trial Counsel Failed To Investigate and Present
Mitigating Evidence In The Penalty Phase of Allison's Trial            31

Claim 31: Ineffective Assistance of Appellate Counsel                  37

CLAIM V.   ACTUAL INNOCENCE                                            38

CLAIM 11 paragraph 12: SUFFICIENCY OF THE EVIDENCEOF
AGGRAVATION                                                            39

CLAIM 15:  INCONSISTENT JURY VERDICT                                   40

CONCLUSION                                                             40

# TABLE OF AUTHORITIES

<u>Allen v. Woodford</u>, 395 F.3d 979 (9th Cir. 2005) <u>31</u>

<u>Avila v. Galaza</u>, 297 F.3d 911 (9th Cir. 2002) <u>22</u>

<u>Banks v. Dretke</u>, 540 U.S. 668 (2004) <u>3</u>

<u>Belmontes v. Ayers</u>, 529 F.3d 834 (9th Cir. 2008) <u>31,36</u>

<u>Berger v. United States</u>, 295 U.S. 78 (1935) <u>passim</u>

<u>Brady v. Maryland</u>, 373 U.S. 83 (1963) <u>15</u>

<u>Bradshaw v. Stumpf</u>, 545 U.S. 175 (2005) <u>4,5</u>

<u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993) <u>15</u>

<u>Brewer v. Williams</u>, 430 U.S. 387 (1977 <u>25</u>

<u>Brown v. Borg</u>, 951 F.2d 1011 (1991) <u>3</u>

<u>Chapman v. California</u>, 386 U.S. 18 (1967) <u>4</u>

<u>Correll v. Ryan</u>, 539 F.3d 938 (9th Cir. 2008) <u>31</u>

<u>Darden v. Wainwright</u>, 477 U.S. 168 (1986) <u>4</u>

<u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974) <u>4</u>

<u>Drake v. Kemp</u>, 762 F.2d 1449 (11th Cir. 1985) <u>4,5</u>

<u>Duncan v. Ornoski</u>, 528 F.3d 1222 (9th Cir. 2007) <u>21, 22</u>

<u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982) <u>31, 32</u>

<u>Fry v. Pliler</u>, 551 U.S. 112 (2007) <u>15</u>

Giles<u> v. Maryland</u>, 386 U.S. 66 (1967) <u>3</u>

<u>Green v. Georgia</u>, 442 U.S. 95 (1979) <u>20, 32</u>

<u>Hall v. Whitley</u>, 935 F.2d 164 (1991) <u>15</u>

<u>Hart v. Gomez</u>, 174 F.3d 1067 (9th Cir. 1999) <u>22</u>

<u>Hill v. Lockhart</u>, 474 U.S. 52 (1985) <u>25, 28</u>

<u>House v. Bell</u>, 547 U.S. 518 (2006) <u>39</u>

<u>In re Sakarias</u>, 35 Cal. 4th 140 (Cal. 2005). <u>passim</u>

<u>Jacobs v. Scott</u>, 513 U.S. 1067 (1995) <u>6</u>

1   Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002)          18

2   Kimmelman v. Morrison, 477 U.S. 365 (1986)                   18

3   Lambright v. Schriro, 490 F.3d 1103 (9th Cir. 2007)          1, 31

4   Lawrence v. Armontrout, 900 F.2d 127 (8th Cir. 1990)         20

5   Lewandowski v. Makel, 949 F.2d 884  (6th Cir. 1991)          25

6   Lockett v. Ohio, 438 U.S. 586 (1978)                         31, 32

7   Lord v. Wood, 184 F.3d 1083 (9th Cir. 1999)                  20, 22

8   Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992)                32

9   Mayfield v. Woodford, 270 F.3d 915 (9th Cir. 2001)           31

10  McGautha v. California, 402 U.S. 183 (1971)                  31

11  Miller v. Keeney, 882 F.2d 1428 (9th Cir. 1989)              38

12  Miller v. Pate, 386 U.S. 1 (1967)                            4

13  Mooney v. Holohan, 294 U.S. 103 (1934)                       passim

14  Napue v. Illinois, 360 U.S. 264 (1959)                       3

15  Nunes v. Mueller, 350 F.3d 1045 (9th Cir. 2003)              25

16  O'Neal v. McAninch, 513 U.S. 432 (1995)                      16

17  People v. Anderson, 43 Cal.3d 1104 (1987)                    passim

18  People v. Davenport, 41 Cal 3d. 247 (1985)                   40

19  People v. Hitch, 12 Cal. 3d 641(Cal. 1974)                   21

20  People v. Ramos, 30 Cal.3d 553 (Cal.1982)                    31

21  People v. Whitt , 51 Cal.3d 620 (1990)                       16

22  Pollard v. White, 119 F.3d 1430 (9th Cir. 1997)              37

23  Powell v. Alabama, 287 U.S. 45 (1932)                        25

24  Rios v. Rocha, 299 F.3d 796 (9th Cir. 2002)                  21

25  Rupe v. Wood, 93 F.3d 1434 (1996)                            32

26  Sanders v. Ratelle, 21 F.3d 1446 (9th Cir. 1994)             22

27  Schlup v. Delo, 513 U.S. 298 (1995)                          39

28  Sechrest v. Ignacio, 549 F.3d 789 (9th Cir. 2008)            4

Smith v. Texas, 543 U.S. 37 (2004)                                  31

Summerlin v. Schriro, 427 F.3d 623 (9th Cir. 2005)                  31

Shaw v. Terhune, 380 F.3d 473 (9th Cir. 2004)                       15

Silva v. Woodford, 279 F.3d 825 (9th Cir. 2002)                     1,19

Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000)                      passim

Strickland v. Washington, 466 U.S. 668 (1984)                      passim

Strickler v. Greene, 527 U.S. 263 (1999)                           3

Stumpf v. Mitchell, 367 F.3d 594 (6th Cir. 2004)                   4

Teague v. Lane, 489 U.S. 288 (1989)                                5

Thompson v. Calderon, 120 F.3d 1045 (9th Cir. 1997)               passim

Turner v. Louisiana, 379 U.S. 466 (1965)                           3

United States v. Blueford, 312 F.3d 962 (9th Cir. 2002)           4

United States v. Higgs, 353 F.3d 281 (4th Cir. 2003)              4

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993)             3

United States v. Young, 470 U.S. 1 (1985)                          3,4

United States v. Leon, 534 F.2d 667 (6th Cir. 1976)               4

United States v. Leonti, 326 F.3d 1111 (9th Cir. 2003)            25

United States v. Scheffer, 523 U.S. 303 (1998)                    33

Valerio v. Crawford, 306 F.3d 742 (9th Cir. 2002)                 16

Wiggins v. Smith, 539 U.S. 510 (2003)                             passim

Williams v. Taylor, 529 U.S. 362 (2000)                           18

Williams v. Washington, 59 F.3d 673 (7th Cr. 1995)                21

Source Abbreviations

<u>Depositions</u>

CD          Deposition of Detective William Collette, November 17, 2008

Mil.D       Deposition of Detective John Miller, November 3, 2008

MD          Deposition of Dr. Michael Maloney,  December 1, 2008

SD          Deposition of Kurt Seifert, August 13, 2008

LD          Deposition of Curt Livesay, August 25, 2008

GD          Deposition of Barney Goldstein, July 28, 2008; August 27, 2008


<u>Evidentiary Hearing sessions</u>

EHvI        September 16, 2008

EHvII       September 17, 2008

EHvIII      September 18, 2008

EHvIV       December 17, 2008

EHvV        December 18, 2008

EHvVI       December 19, 2008


<u>Transcripts</u>

BRT         Reporter's Transcript of Bonner Trial

RT          Reporter's Transcript of Allison Trial

vi

# INTRODUCTION

This court ordered an evidentiary hearing on eight claims.  Those claims are closely intertwined.  While their merits must be assessed individually, the evidence reveals an overall picture that does not reflect well on either the prosecutor, who appears to have placed ensuring Watson Allison was sentenced to death over seeing that justice was served, or the defense attorney who was deficient in all critical stages. For the reasons argued below, Allison respectfully requests that the jury's verdict as to the allegation that he personally used a handgun to murder Wesley Polk and the robbery murder special circumstance that qualified him for death be reversed, his sentence of death be lifted, and this court grant him a new trial as to the personal use allegation and the special circumstance or impose the sentence of twenty-five years to life that would have been the most probable outcome of a proceeding in which his constitutional rights to Due Process, a Fair Trial and Effective Assistance of Counsel were not violated .

# STANDARD OF REVIEW AND BURDEN PROOF

Allison's federal habeas petition was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and thus, pre-AEDPA standards apply to his claims.  Lambright v. Schriro, 490 F.3d 1103, 1113 (9th Cir. 2007).  Petitioner has the burden to prove his custody is in violation of the Constitution, laws or treaties of the United States by a preponderance of the evidence.  Silva v. Woodford, 279 F.3d 825, 835 (9th Cir. 2002).  Because the state court summarily denied petitioner's claims without resolving the merits of the factual disputes underlying his claims, the presumption of correctness otherwise due state court fact-finding prior to passage of AEDPA does not apply.  28 U.S.C 2254(d)(19944)(superseded).

# EVIDENCE OF WHO SHOT POLK

Allison's claims for relief rest largely, albeit in different ways, on whether evidence available at the time of his trial supported the prosecution theory he shot

1

Polk[1].  As this court noted in its order granting an evidentiary hearing ("OEH"), "the evidence [presented at trial] that <u>petitioner</u> was the shooter, or that <u>petitioner</u> intended Polk's death, was extremely weak."  OEH 67.  In this proceeding, Prosecutor Seifert testified he was "not aware" of any evidence that pointed to Allison as the actual shooter, SD 161-162; and that the state's investigation never produced any evidence that Allison used a firearm and shot Polk.  SD 116, 161, 179; EHvIVp  26, 39, 121-122, 137-138.  The only evidence directly pointing to the identity of the shooter was jailhouse informant Michael Hayes' statement that Bonner admitted to shooting Polk.  Ex. 18.  In Allison's trial, the only support for the allegation that Allison was the shooter was an inference from the fact that Allison was in Polk's apartment and Seifert's false assertion there was no evidence to suggest Bonner was in the apartment.  RT 808-809.  If, as the evidence suggests[2], it is more probable than not that Bonner was in Polk's apartment, that substantially weakens the power of the inferences necessary to find Allison eligible for the death penalty and a sentence of death.

**CLAIM 1:  PROSECUTOR SEIFERT'S PRESENTATION OF EVIDENCE AND ARGUMENT AT ALLISON"S TRIAL THAT INHERENTLY AND IRRECONCILABLY CONTRADICTED EVIDENCE AND ARGUMENT AT BONNER'S TRIAL VIOLATED DUE PROCESS.**

<u>A.     The Presentation Of Irreconcilably Contradictory Evidence And Factual Theories At The Separate Trials Of Two Defendants Violates Long Established Constitutional Rules.</u>

---

[1] The claim defense counsel was ineffective for failing to present mitigating evidence in the penalty phase does not depend on whether Allison was the shooter. However, as argued below, because of its relevance to the only aggravating circumstance, the weakness of the evidence Allison shot Polk must be considered in determining whether the mitigating evidence that could and should have been presented outweighed the aggravating circumstances.

[2] A summary of evidence presented in this proceeding is attached. ("Pet. Sum.")

2

The Due Process clause guarantees every defendant a right to a fair trial. See <u>Turner v. Louisiana</u>, 379 U.S. 466, 471-472 (1965).  Three-quarters of a century ago, the Supreme Court rejected a "narrow view of the requirements of due process" and held that due process was violated "if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1934).  Following <u>Mooney</u>, the Supreme Court has held that due process is violated when the prosecution fails to correct false testimony, <u>Napue v. Illinois</u>, 360 U.S. 264, 265 (1959); see also Giles <u>v. Maryland</u>, 386 U.S. 66, 87 (1967)(prosecutor's duty to refrain from soliciting false evidence and correct false evidence he does not intentionally elicit).

One year after <u>Mooney</u>, the Supreme Court enunciated the principle that it is a prosecutor's "duty to refrain from improper methods calculated to produce a wrongful conviction. . . ." <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935); see also <u>United States v. Kojayan</u>, 8 F.3d 1315, 1323 (9th Cir. 1993)("The prosecutor's job isn't just to win, but to win fairly, staying well within the rules").  Since <u>Berger</u>, the Supreme Court has "several times underscored the 'special role played by the American prosecutor in the search for truth in criminal trials.'" <u>Banks v. Dretke</u>, 540 U.S. 668, 696 (2004)(quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999); see also <u>Smith v. Groose</u>, 205 F.3d 1045, 1053 (8th Cir. 2000)(due process requirement that the government prosecute fairly in a search for truth is not a new rule of law).  Citing <u>Berger</u>, the Supreme Court has held that a prosecutor's comments in closing argument can prejudicially affect jury's verdict by "convey[ing] the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." <u>United States v. Young</u>, 470 U.S. 1, 18-19 (1985); see also <u>Brown v. Borg</u>,

951 F.2d 1011, 1017 (1991)(citing  Chapman v. California, 386 U.S. 18, 24 (1967) as an example that "[i]mproprieties in closing argument can, themselves, violate due process").

When a prosecutor relies on evidence in closing argument that he knows to be false, his misconduct violates Mooney-Napue.  See e.g. Miller v. Pate, 386 U.S. 1, 4 (1967)(prosecutor referred repeatedly to bloody shorts knowing stains were paint).  But a prosecutor can commit misconduct by making closing arguments that improperly influence a jury by vouching for witnesses, Young, 470 U.S. at 18-19, bringing purported facts not in the record to the attention of the jury, United States v. Leon, 534 F.2d 667, 679 (6th Cir. 1976), or propounding inferences that he has very strong reason to doubt, United States v. Blueford, 312 F.3d 962, 968 (9th Cir. 2002).  When specific guarantees of the Bill of Rights such as the privilege against self-incrimination are involved, "the Supreme Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly v. DeChristoforo, 416 U.S. 637, 644 (1974).  Otherwise, the test is whether the misconduct "so infects the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); Sechrest v. Ignacio, 549 F.3d 789, 812 (9th Cir. 2008).

Based on the principles enunciated in Mooney and Berger, five circuits and the Supreme Court of California have found, or implied, that the due process clause is violated by the use of factually inconsistent theories to secure convictions of more than one defendant for the same crime.  See Stumpf v. Mitchell, 367 F.3d 594 (6th Cir. 2004) reversed on other grounds, Bradshaw v. Stumpf, 545 U.S. 175 (2005); United States v. Higgs, 353 F.3d 281, 326 (4th Cir. 2003); Smith, 205 F.3d 1045; Thompson v. Calderon, 120 F.3d 1045 (9th Cir. 1997)(en banc), 523 U.S. 538 (1998); Drake v. Kemp, 762 F.2d 1449 (11th Cir. 1985)(en banc)(Clark, J., specially concurring); In re Sakarias, 35 Cal. 4th 140, 155-156 (Cal. 2005).

In Stumpf, the Supreme Court reversed the lower court because Stumpf

failed to explain how the prosecution's post-plea use of inconsistent arguments affected the plea.  545 U.S. at 187.  The majority did not reject the lower court's reasoning that a prosecutor's use of inconsistent, irreconcilable theories to convict two defendants for the same crime could render a conviction unreliable and violate due process.  To the contrary, the Court noted "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence," and remanded that issue back to the lower court without expressing an opinion on whether the prosecutor's conduct amounted to a due process violation[3].  Id. at 187.

The fact that a prosecutor presented contradictory evidence in two successive trials, by itself, supports a strong inference that it is more likely than not that he knowingly presented evidence in the second trial that he knew or should have known was false.  See Drake, 762 F.2d at 1479 (where prosecutor attacked defendant's testimony at first trial as unbelievable and argued he must have been sole murderer, then called him to testify to a different version of the events at a co-defendant's trial, the conclusion seems inescapable that the prosecutor obtained the second conviction through the use of testimony he did not believe).  The presentation of irreconcilable factual theories in the separate prosecutions of two co-defendants also necessarily violates due process where the prosecution presents material evidence to support that theory in the trial of a defendant, then without

---

[3] The majority declined to apply Teague v. Lane, 489 U.S. 288 (1989), which the state did not raise.  Stumpf, 545 U.S. at 182.  Two justices wrote the Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."  Id. at 190 (Thomas and Scalia, conc.).  This formulation elides a critical qualifier in the opinions  finding a due process violation.  See Stumpf, 367 F.3d at 611 ("inconsistent, irreconcilable theories"); Smith, 205 F.3d at 1052  ("inherently factually contradictory theories"), Thompson, 120 F.3d at 1058 ("inconsistent theories and facts concerning the same crime"), and In re Sakarias, 35 Cal. 4th at 159 ("irreconcilable theories of guilt or culpability").

having discovered any reason to doubt that evidence, presents contradictory evidence concerning the same material fact in the subsequent trial of a co-defendant. See Thompson, 120 F.3d at 1058 (it is well established that when no new significant evidence comes to light a prosecutor cannot offer inconsistent theories and facts regarding the same crime).

In this case, the prosecutor manipulated the evidence presented in Allison's trial to prevent the jury from concluding that co-defendant Bonner was in Polk's apartment. He presented evidence he knew or should have known was false, misrepresented evidence in the record, introduced evidence in closing argument, and propounded critical inferences he had very strong reason to doubt. Through these acts of misconduct he orchestrated a trial that was substantially and undeniably infected with unfairness and, as a result, produced an unreliable verdict and sentence. See Jacobs v. Scott, 513 U.S. 1067, 1070 (1995)(Stevens, J., dis.)("heightened need for reliability" in capital cases underscores gravity of the questions raised when the prosecutor takes inconsistent positions in two separate criminal proceedings).

B.   The Evidence and Argument Presented in Allison's Trial Irreconcilably Contradicted The Evidence And Argument Presented In Bonner's Trial On The Critical Material Issue of Whether Bonner Was In Polk's Apartment

As this court recognized in its order granting an evidentiary hearing, Prosecutor Seifert clearly presented a factual theory (Bonner was not in the victim's apartment) at Allison's trial that irreconcilably contradicted the factual theory (Bonner shot the victim) he had presented in Bonner's trial. OEH at 32, 47-50, 114-16. In Bonner's trial, Seifert presented Bonner's admissions to jailhouse informant Michael Hayes as "direct evidence" Bonner shot Polk, BRT 404. He corroborated that allegation with testimony it took two or three people to carry a crate of albums out of Polk's apartment, BRT 187, 223; that the placement of Bonner's palm print on a stereo amplifier taken from Polk's apartment proved it

6

had been placed there as Bonner was carrying the amplifier out of the apartment, BRT 195-97; and that a fuse at the scene matched fuses found in Bonner's pocket, BRT 237-39. Seifert also established that none of the eyewitnesses saw Bonner go into Polk's apartment by eliciting testimony from Ray Johnson, that even though he only saw one person putting property in Polk's car, there were several ways someone could have carried things out without him seeing them, BRT 164-65; and from Officer Davenport that even though he did not see Bonner's car drive back to the apartment, someone could have driven back without him seeing them and he did not check the garage under Polk's apartment, BRT 274.

After more than three days of deliberations, RT 458-69, the jury found Bonner guilty of felony robbery murder -- and found true the robbery murder special circumstance, BRT 469-70. The jury found not true that Bonner had personally used a gun and that a principal had been armed. BRT 470. The district attorney's office chose not to proceed with the penalty phase and Bonner was sentenced to life without possibility of parole, BRT 474, which was reduced to 25 years to life after an appellate court reversed the special circumstance finding based on Carlos error. Ex. 31.

After Bonner trial's, the prosecution obtained no new information or evidence regarding the case. SD 132; EHvIVp122; CD 133-34. Despite this fact, Seifert presented the jury in Allison's trial with a core factual theory that was premised on there being no evidence Bonner was in Polk's apartment. If Seifert had uncovered any evidence directly tending to prove that Allison was the shooter, it would not have mattered whether Bonner was present. But Seifert never had a stitch of evidence that Allison was the shooter. SD 116, 161, 179; EHvIVp 26, 39, 121-22, 137-38. Seifert's manipulation of the evidence was most egregious with regard to the failure of witnesses to observe Bonner entering Polk's apartment and the placement of Bonner's palm print on the amplifier. (Seifert also took contradictory positions regarding a fuse found outside Polk's apartment. BRT 366;

RT 892.)

At Bonner's trial, Seifert, speaking as if he were a juror looking back at the evidence, argued that Bonner must have gone back unseen because "where else could the other stuff go unless the guy driving the Ford went back unseen. . ." and explained, " the guy was lost from view for some period of time."  He then invoked the authority of the court: "we knew because the judge told us, that everybody doesn't see everything and everybody sees things from their own perspective and somewhat differently; and concluded "as men and woman reasonably and logically attempting to look for truth, we could understand how Officer Davenport didn't see everything, nor did Mr. [Johnson]."  BRT 369-70.

At Allison's trial, Seifert ended his direct examination of Johnson by confirming that, after seeing Polk next to Bonner's Ford, Johnson did not see the Ford again that day.  RT 487-88.  Since Seifert did not call Davenport to testify at Allison's trial, he did not have to question him about the gaps in his observations of the area around Polk's apartment.  In closing, Seifert emphasized that the neighbors "[d]idn't see the other guy [Bonner] at all, except driving the Ford automobile,"  RT 822;  "the other person involved in the crime, Mr. Bonner was seen by the witnesses driving off in the Ford, never doing anything but driving the Ford," RT 823;  and "[i]ts just not true. . . . [Allison] can't explain and did not explain how it could be that he and Mr. Bonner did not meet before this alleged exchange of driving the different vicles, which according to the other witnesses never occurred.  Never was observed by them."  RT 830.

At Bonner's trial, Seifert elicited testimony from Officer Corson suggesting Bonner's palm print must have been placed on the amplifier as he was carried it out of the apartment.  BRT 195-97.  Then, speaking as a juror looking back at the evidence, he argued:

> . . . we know how the stereo was stacked. We know where it
> was located, and <u>we know . . . it would have been impossible to put</u>

that piece of print on there by the following means, as was
demonstrated by no less than two witnesses in court.

    The palm print of the left hand of Samuel Bonner and no other
person in this world was placed fingers up on the back side of the
instrument in such a way as to demonstrate carrying it or moving it,
and its weight had caused the impression of the palm print on the back
of the instrument.

    . . . . reason and logic tells us that palm print was placed in that
particular place on that particular instrument because . . . Bonner
carried it out of the apartment unseen by . . . Johnson. . .”

    “[H]ow do you know . . . Johnson didn’t see this defendant
carry it out?”

    . . . we know . . . [h]e saw the TV being carried out.  He saw a
duffel bag and two speakers, and that’s it. . . . Bonner’s fingerprints
are not on any of those items, as far as we know. . . .  But his
fingerprint, coincidentally, is on one of the items that Watson Allison
did not remove from the apartment.

    You cannot ignore the impact of the logical inference from that
item of evidence.”  BRT 375-77.

Seifert did not call Corson to testify at Allison’s trial.  Instead, he
called Officer Kergil to confirm only that the print lifted from the amplifier
was Bonner’s.  RT 694.  In closing, Seifert argued:

    . . . to put Mr. Bonner in the apartment, counsel made one argument
that the fingerprint on the stereo could have been put there in the
apartment.  I suggest to you logically and reasonably, it could not
have been.

    Why is that?  Reconstruct the physical set up of the apartment
as described by Angela Hunter.  And for that purpose, I have gotten a
little cardboard box here which isn’t the same size as the wooden
crate, but you have a picture of the wooden crate to get an idea of its
dimension.  You have a picture of the stereo equipment and where it is
located as described by the evidence.

    Assuming, for illustration, this is the crate.  We have the record
player on top stacked up against the wall, we know.  Record player on
top, and below it, the stacked items of equipment inside the box.  That
is the tuner and the amplifier.

    I ask you to figure out how it could be since only Watson

Allison moved the stereo, picked it up and took it out, as he said, how Samuel Bonner's print could have gotten inside the box, down and around the back and printed the back of the equipment when it's Allison moved it and took it. That didn't happen. Logically, reasonably, and truthfully didn't happen. RT 895-96.

In his deposition, Seifert admitted that his assertion at Allison's trial that the palm print "could not have been" put there in the apartment was completely inconsistent with his assertion at Bonner's trial that Bonner's palm print had to have been placed on the amplifier in Polk's apartment; and he labeled the statement at Allison's trial, "the big oops. " SD 113-14.

C.     Seifert lacked a good faith basis to present evidence and propound inferences at Allison's trial that Bonner was not in Polk's apartment.

Seifert remembered "very little" about the two trials, SD 36-37, including even that he sought the death penalty against Bonner, SD 11, what he was convicted of, SD 66, 70, 173, or the theory he presented in Allison's trial. SD 72. When asked to characterize his argument in Bonner's trial, he admitted, "I'm not sure what my intention was. The words have to speak for themselves." SD 148.

At his deposition, after Seifert had struggled to explain the clear contradictions between the evidence he presented at the two trials, the Attorney General improperly suggested that he changed his theory because of the jury's verdict:

> Q.     BY MR. TARYLE: Did the nature of the jury's verdict with respect to the firearm allegations have an effect on the theory that you were pursuing as to who the actual shooter was at the Allison trial?
>
> A.     Now that I've been refreshed and told about it, I think so. It would have had to.
>
> Q.     In what way?
>
> A.      . . . no independent recall on my part. If the jury found Mr. Bonner did not or was not proven as -- again, I think I said this -- if they found that he did not shoot at least beyond a reasonable doubt, I

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

think that leaves the door open or did leave the door open to pursue
what we could as to any viable theory as to Mr. Allison.  SD 160.

From this point forward, Seifert sought to use the jury's verdict to justify his shift.
EHvIVp 35-38.  But there is no evidence he based his shift on faith in the jury's
judgment.  A more plausible explanation is that, having failed to get the verdict he
wanted from Bonner's jury, Seifert manipulated the evidence he presented to
Allison's jury to ensure he would get a death verdict the second time.

　　　The Bonner jury deliberated for more than three days.  BRT 458-69.  The
evidence that Bonner was guilty of felony robbery murder -- e.g. eyewitness
testimony that he was seen talking to Polk, a note with the intersection near Polk's
apartment found in his car, and his palm print on the amplifier -- was strong.  The
most probable reason for the jury's lengthy deliberations was that, after listening to
the evidence, including Hayes' testimony, at least some jurors believed Bonner did
shoot Polk.  That Bonner's jury did not find the personal use allegation as to
Bonner true beyond a reasonable doubt does not prove that all jurors were
convinced Bonner was not the shooter.  If only one juror believed it was more
probable than not that Bonner shot Polk; then, the Bonner jury could not have
found that Allison shot Polk; and Seifert was aware of at least two items of
evidence -- the police reports that human blood was on Bonner's clothes and that
Bonner had shown deception in a polygraph examination -- which could have
caused the jury to reach a different verdict even as to Bonner.

Seifert also implied he changed his theory because Hayes testified Bonner
told him he shot Polk with a .357 Magnum, when Seifert knew it had been a .22.
SD 26.  But Hayes' testimony that Bonner admitted shooting Polk could have been
true even though Hayes was mistaken about the gun, Pet. Sum. §III ; and there is
no evidence that Seifert told the Bonner jury, Bonner's attorneys, or anyone in the
District Attorney's office that he believed Hayes had lied on the witness stand.
EHvIVp 94-99.  Even if Seifert did come to believe that Hayes' testimony was

11

false, that would not have provided a good faith basis for him to tailor the evidence at Allison's trial to support his allegation that Bonner was not in Polk's apartment.

In the two-and-one-half months between the trials, the state obtained no new evidence to support a factual theory that Bonner was not present in Polk's apartment or that Allison was the shooter.  SD 132; EHvIVp 122; CD 133-134; and, Seifert testified that, after Bonner's trial, he still believed Bonner was in Polk's apartment.  SD 115; SD 174-175.  Given the evidence corroborating Hayes, Pet. Sum. §III , Seifert's obvious memory problems, the absence of any evidence to substantiate Seifert's claim he disavowed Hayes before the Allison trial, the probability that at least one juror in the Bonner trial was persuaded that Bonner shot Polk and the fact that Seifert's remembrance of believing Hayes lied and his refreshed memory of his faith in the Bonner jury's weighing of the evidence are convenient rationalizations for his shift, there is no basis to find that Seifert had a good faith reason to present a factual theory at Allison's trial that irreconcilably contradicted the factual theory he presented at Bonner's trial.

C.     Seifert's presentation of evidence and argument violated Allison's constitutional right to due process.

The mere fact Seifert presented conflicting arguments would not, by itself, constitute a violation of due process.  But, in presenting irreconcilable factual theories, Seifert manipulated his case-in-chief to keep the jury from hearing evidence he used in the Bonner trial to prove Bonner was in Polk's apartment, propounded inferences in closing argument that, based on evidence he presented in Bonner's trial, he had strong reason to doubt, and used a demonstration in his closing rebuttal to put evidence before the jury that was not in the record and that he had reason to know was false.  Individually, these acts might have been inadvertent and/or defensible; but cumulatively, and given the evidence known to Seifert, his misconduct systematically infected Allison's trial with unfairness and resulted in an unreliable verdict.

Based on Corson's testimony, Seifert had strong reason to believe that Bonner had placed his palm print on the amplifier as he carried it out of the apartment. BRT 195-97. Pet. Sum. §V. There is no evidence that Seifert obtained any information after Bonner's trial that caused him to doubt Corson's testimony. As the prosecutor did in <u>Sakarias,</u> Seifert appears to have intentionally refrained from presenting evidence relevant to culpability at Allison's trial that he had presented in the co-defendant's trial. See <u>Sakarias,</u> 35 Cal.4th at 153-54 (omissions of exhibit and questioning regarding abrasion were designed to avoid presenting evidence "inconvenient" to prosecutor's new and different theory of the attack). Then, having omitted Corson's testimony, Seifert propounded an inference -- "[l]ogically, reasonably, and truthfully," Bonner could not have carried the amplifier out of the apartment," RT 896 -- that he (Seifert) had strong reason to doubt based on his knowledge of Corson's prior testimony. Seifert also used an evidentiary sleight of hand to present evidence to the jury that was never in the record: In his closing rebuttal, he showed the jury a cardboard box to demonstrate how the stereo components would have been stacked inside a box before they were removed from Polk's apartment. RT 895. Based on this demonstration, Seifert asserted Bonner's print could not "have gotten inside the box, down and around the back and printed the back of the equipment when it's Allison moved it and took it." RT 896. He suggested his demonstration was based on testimony by Polk's sister, RT 895, but her testimony did not provide any basis for the inference that Bonner's print could <u>not</u> have gotten on the amplifier while it was being carried out of Polk's apartment. By saving this demonstration for the last presentation the jury would hear, Seifert ensured Allison could not subject the proponent of the evidence -- Seifert himself -- to cross-examination or rebut the false inference he propounded based on it.

Seifert also chose not to call Davenport. That is surprising since Davenport reported seeing a passenger in Bonner's car go into Polk's apartment, then come

out and put a duffle bag in a white car.  BRT 271-72.  Based on his report, however, Davenport saw Bonner's Ford parked at a gas station with <u>two</u> men in it <u>after</u> he saw the person with the duffle bag.  Ex. 61.  This corroborates Allison's testimony that he and Bonner drove to the gas station after meeting Polk on the street and before either of them drove back to Polk's apartment to rob him,  RT 738-39; and confirms that Bonner could have driven back to Polk's apartment before Polk was shot without being seen by Davenport.  BRT 274.

Based on Davenport's report, the testimony he elicited from Davenport and Johnson, the palm print, the number and size of the items taken from Polk's apartment, Hayes' testimony, and the evidence that human blood was found on Bonner's clothes, Seifert knew there was a substantial amount of evidence Bonner was in Polk's apartment.  Pet. Sum. §III-VII.  Despite that, he told the jury "[a]ll the evidence that's reasonable and believable . . . shows Bonner was not the inside man,"  RT 809;  "the only evidence of anyone present in the apartment was the fingerprint of Mr. Allison inside," RT 822; and "the evidence shows [Bonner] is a relatively minor participant," RT 830.

Given the short period between the trials, it is implausible that Seifert acted inadvertently.  As an experienced prosecutor, he would have recognized the weakness of the evidence supporting the personal use allegation as to Allison[4] and, hence, the importance of dissuading the jury that Bonner could have shot Polk.  It is inconceivable that Seifert was <u>not</u> aware that, on the crucial issue of whether Bonner was in Polk's apartment, the factual theory he presented at Allison's trial totally contradicted the factual theory he presented at Bonner's trial.  See <u>Sakarias,</u> 35 Cal.4th at 152-53 (improbable that prosecutor's factual depiction of killing in

---

[4] In his opening statement, Seifert acknowledged that it was his burden to prove Allison "personally used the gun that killed the victim."  RT 423.  But he never explained how he would do that.  The obvious reason was he did not have any evidence that Allison used the gun to shoot Polk.  SD 161-62.

trial one would have totally escaped his notice in trial two).

Seifert's acts of misconduct and the inconsistencies were directly relevant to the core factual issue in Allison's trial -- whether Allison was the shooter.  See Smith, 205 F.3d at 1052 (inconsistency existed in the core theory of the prosecutor's case).  By falsely declaring there was no "reasonable and believable" evidence that Bonner was "the inside man," 809 -- and  "[l]ogically, reasonably, and truthfully," Bonner could not have carried the amplifier out of the apartment, RT 896 -- Seifert deliberately cast himself as "an architect of a proceeding that does not comport with standards of justice," Brady v. Maryland, 373 U.S. 83, 88 (1963).  In contrast, with Hall v. Whitley, 935 F.2d 164,165-166 (1991), where the Ninth Circuit found that a prosecutor's misconduct did not violate due process, Seifert's misconduct related directly to a state of mind element, was not limited to "isolated moments in a three day trial," and the evidence that Allison was the shooter was incredibly weak rather than overwhelming.  For these reasons, following the long established rules flowing from Mooney and Berger, Seifert's prosecution of Allison based on a factual theory that irreconcilably contradicted the factual theory he presented in Bonner's trial violated due process.

D.     Seifert's manipulation of evidence and misconduct in closing argument was not harmless.

"Prosecutorial misconduct . . . may provide the grounds for granting a habeas petition only if that misconduct is deemed prejudicial under the 'harmless error' test articulated in Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)." Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir. 2004).  Brecht requires that the reviewing court independently evaluate whether an error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  "[T]he Brecht standard  . . . imposes a significant burden of persuasion on the State."  Fry v. Pliler, 551 U.S. 112, 122 (2007)(Stevens,J., dis.).  When a court is "in virtual equipoise as to the harmlessness of the error" under the Brecht standard,

1  the court should 'treat the error . . . as if it affected the verdict . . . ." <u>O'Neal v.</u>
2  <u>McAninch</u>, 513 U.S. 432, 435 (1995).  Error is not harmless when, if properly
3  instructed, a single member of the jury could have come to the conclusion, based
4  on the evidence presented, that an aggravating circumstance did not exist.  <u>Valerio</u>
5  <u>v. Crawford</u>, 306 F.3d 742, 763-64 (9th Cir. 2002).

6       Seifert's misconduct directly affected the jury's findings on the personal use
7  allegation and the robbery murder special circumstance, and the jury's weighing of
8  the factors in aggravation and mitigation in the sentencing phase.  Former Chief
9  Deputy District Attorney Livesay, whose job required him to assess the likely
10  impact of evidence on Los Angeles County jury verdicts at the time of this trial,
11  testified that "fashioning the evidence" to show only one person was in the room at
12  the time of the killing would influence a jury's verdict.  LD 96, 174-75.

13       The jury was instructed that if it found Allison guilty of first degree murder,
14  then it must determine if the special circumstance -- "murder in the course of
15  robbery with the intent to kill or the specific intent to aid in the killing" -- applied.
16  CT 264; RT 920.  The California Supreme Court subsequently ruled that "intent to
17  kill [was] not an element of the felony-murder special circumstance; but when the
18  defendant is an aider and abetter rather than the actual killer, intent must be proved
19  before the trier of fact can find the special circumstance to be true."  <u>People v.</u>
20  <u>Anderson</u>, 43 Cal.3d 1104, 1138-39 (1987); <u>People v. Whitt</u> , 51 Cal.3d 620, 638
21  (1990)(<u>Anderson</u> applies to pre-<u>Carlos</u> felony murders).  By finding true that
22  Allison "personally used a firearm," the jury appears to have found he shot Polk
23  and, therefore, was not merely an aider and abettor.  The only basis for the jury to
24  find he was the shooter was that if Bonner was not in the apartment ipso facto
25  Allison had to have been the shooter.  Seifert could have argued, as he did in
26  Bonner's trial, that both co-defendants were in the apartment -- and presented
27  evidence that even if Allison was only an aider and abettor he still had the requisite
28  intent for the jury to find him eligible for death.  But he chose to argue Allison was

alone in the apartment.  By making this choice, and going to great lengths to make it appear inconceivable that Bonner could have been present, Seifert implicitly confirmed the importance of establishing that Bonner was <u>not</u> in the apartment.  If Allison's jury had heard Corson's testimony regarding the placement of  Bonner's palm print (instead of the misleading box demonstration Seifert presented in his closing rebuttal) and also that, contrary to Seifert's closing argument, it was very easy for Bonner to have entered and left Polk's apartment without being seen  Pet. Sum. §VI, there is a reasonable probability that at least one juror would have formed a reasonable doubt that Allison shot Polk and had the intent necessary for the special circumstance to be found true .  Seifert's misconduct also had a substantially injurious effect on Allison's death sentence.  The only significant aggravator he presented was the circumstances of the crime:

> The manner of inflicting death, as you found, was <u>at the hands of</u>
> <u>Watson Allison,</u> bullets in the back of the head, execution style.
> I don't believe that you can find that the circumstances of the crime,
> the circumstances surrounding the special circumstance of murder in
> the course of robbery, can bespeak of anything but that this is a factor
> in aggravation and may weigh heavily against Mr. Watson's [sic]
> favor."  RT 959.

Seifert repeatedly emphasized that the jury's verdict meant it had found Allison to be "the user of a firearm, meaning he personally killed Leonard Wesley Polk . . ."  RT 965.  And he suggested that, by its verdict, the jury had found the defense's effort to blame Bonner "to be false, and properly so under the evidence." RT 962-63.  Absent a belief that Allison shot Polk, there were no factors in aggravation that individual jurors could have reasonably found warranted a death sentence.  Thus, there is a reasonable probability that, but for Seifert's misconduct, the jury would have weighed the sentencing factors differently and decided against the death penalty.  For these reasons, Seifert's misconduct was not harmless; and the special circumstance finding he obtained as a result should be set aside.

**INEFFECTIVE ASSISTANCE OF COUNSEL**

To prevail on his ineffective assistance of counsel claims, Allison must demonstrate (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different..." Williams v. Taylor, 529 U.S. 362, 390-91 (2000); Strickland v. Washington, 466 U.S. 668, 690-93 (1984). In deciding deficiency, the court must judge counsel's conduct based on the facts of the case, "viewed as of the time of counsel's conduct" and must decide if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 464 U.S. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003)(the proper measure of attorney performance is reasonableness under prevailing professional norms). Counsel is presumed to be competent, but "[i]n making the competency determination, the court 'should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.'" Kimmelman v. Morrison, 477 U.S. 365, 385 (1986)(quoting Strickland, 466 U.S. at 690). "Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, . . .'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Id.

To establish prejudice, Allison must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694. A petitioner need not show it is more likely than not that the outcome of the proceeding would have been different, Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002), cert. denied, 539 U.S. 958 (2003), but only "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The Strickland standard applies to

performance at the penalty phase of a capital trial, <u>Silva</u>, 279 F.3d at 836, where petitioner must show "a reasonable probability that, absent [counsel's errors], the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Strickland</u>, 466 U.S. at 695.

**CLAIM 2(B):  Trial Counsel Failed to Discover, Investigate and Present Exculpatory Evidence**

Trial counsel Goldstein failed to discover, investigate and present three critical pieces of evidence -- Hayes' testimony Bonner admitted he shot Polk, Corson's testimony Bonner's palm print was placed on the amplifier when he was carrying it, and Hoover's report that stains found on Bonner's clothes were human blood -- that would have allowed him to create reasonable doubt that Allison shot Polk or intended his death.

<u>Bonner's Admission to Hayes:</u>  Testimony that Bonner had admitted to shooting Polk would have obviously negated Seifert's contention that Allison shot Polk.  A minimally competent attorney would, therefore, have recognized that Hayes' statement and testimony were exculpatory evidence.  Ex.90¶ 22.  Goldstein does not remember having any knowledge of Hayes' testimony at Bonner's trial.  GD 223.  But he did receive Detective Miller's report of the Hayes interview and have his investigator interview Hayes to confirm Bonner admitted he shot Polk.  Ex.1¶11.  Goldstein has no contemporaneous memory of why he failed to call Hayes as a witness at Allison's trial.  GD 107, 225.  There is no evidence that he received any information that caused him to doubt Hayes' veracity; and, since he did not obtain any information about the Bonner proceedings, he could not have reasonably decided not to call Hayes based on them, GD 223.  In1994, Goldstein declared that he believed Hayes' testimony was inadmissible because it was hearsay as to Mr. Allison and did not qualify for admission under the declaration against interest exception set forth in California Evidence Code section 1230.  Ex.1¶12.  But, as a minimally competent attorney would have known, Bonner's

1  admission would have been admissible in all phases of Mr. Allison's trial as a

2  declaration against interest under California Law, Cal. Ev. §1230; Ex.90¶23; and,

3  given the fact that the state had called Hayes as a witness in Bonner's trial, its

4  exclusion would have violated the Due Process Clause, <u>Green v. Georgia</u>, 442 U.S.

5  95, 99 (1979)(Due Process bars the state from applying the hearsay rule

6  "mechanistically" to exclude testimony of an admission that the state found

7  sufficiently reliable to use against co-defendant).  Because Hayes was in custody

8  and had testified under oath at Bonner's trial, BRT 309-27, Goldstein would have

9  been able to subpoena him and there is a record of what he would have testified to

10  at Allison's trial.  See <u>Lawrence v. Armontrout</u>, 900 F.2d 127, 130 (8th Cir.

11  1990)(Petitioner has burden of showing witness would have testified and it would

12  have been favorable).  Thus, Goldstein's failure to research the rules of evidence

13  and learn he could call Hayes was objectively unreasonable.  Ex. 90¶ 23;

14      <u>Testimony About Bonner's Palm Print:</u>  In Allison's trial, Goldstein argued

15  Bonner's palm print had to have been placed on the amplifier sometime on the day

16  Polk was shot.  RT 863-64.  Corson's testimony concerning the placement of

17  Bonner's palm print on the amplifier would have supported this argument.  Pet.

18  Sum. §V.  Since that testimony was entirely consistent with his closing arguments,

19  Goldstein could not have had any tactical or strategic reason not to call Corson.

20  The only possible explanation for his failure to call him is that, because he did not

21  attend, or obtain a transcript of, Bonner's trial, Goldstein was unaware of Corson's

22  testimony.  GD 182-83.  If Goldstein had discovered his prior testimony, he would

23  have been able to present Corson to corroborate Allison's testimony; and if Corson

24  had testified differently than he did in Bonner's trial, Goldstein would have been

25  able to impeach him using his prior testimony.  Cal. Ev. Code. 1235.  Goldstein's

26  failure to discover Corson's prior testimony and call him as a witness was

27  objectively unreasonable.  See <u>Lord v. Wood</u>, 184 F.3d 1083, 1095-96 (9th Cir.

28  1999)(counsel's cursory investigation of possible alibi witnesses and subsequent

failure to put them on the stand constitute deficient performance).

The Blood on Bonner's Clothes:  Goldstein has no independent recollection that human blood was found on Bonner's clothes.  GD 118, 232.  Although Hoover's reports were never given to the defense, Ex.1¶; GD 118, Goldstein saw pictures of the stains and heard that Hoover had tested them at a suppression hearing on October 18, 1983.  BRT 84-87; GD 121.  Goldstein's failure to grasp the importance of the information Collette disclosed in the suppression hearing was, in and of itself, deficient.  See Williams v. Washington, 59 F.3d 673 (7th Cr. 1995)(because counsel failed to read letter that corroborated witness' testimony, he was unable and unprepared to make any strategic decisions).  As Goldstein acknowledged, this evidence would have helped to establish that Bonner was in Polk's apartment.  Ex.1¶6; GD 232.  Goldstein's failure to discover and investigate evidence of blood stains on Bonner's clothes was, therefore, grossly deficient. Ex.90¶17; see Duncan v. Ornoski, 528 F.3d 1222, 1235 (9th Cir. 2007)(failure to conduct any investigation of blood evidence unreasonable under prevailing professional norms); Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002)(failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence) .

Hoover's report there was human blood on Bonner's clothing, which the Bonner jury did not hear, would have also corroborated Hayes' testimony.  Pet. Sum. §IV.  Seifert evidently could not present Hoover's report as evidence against Bonner because there were no remaining samples for the defense Bonner to test. BRT 328; see People v. Hitch, 12 Cal. 3d 641(Cal. 1974)(if prosecution fails to fulfill its duty to preserve test samples, the results of the test shall be excluded from evidence).  But that would not have barred Goldstein from introducing the pictures of the stains on Bonner's clothing taken by Collette that were admitted at the suppression hearing, Ex.27; calling Collette to authenticate the pictures and the fact that Bonner's clothes had been seized from him on the night of Polk's murder,

BRT 84-87; and then calling Hoover to testify that his testing had conclusively determined that the stains were human blood, Exs.37, 38.

Goldstein's failure to present these three critical pieces of exculpatory evidence was clearly deficient. The Ninth Circuit has "repeatedly held that '[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.'" <u>Duncan</u>, 528 F.3d at 1234 (9th Cir. 2007)(quoting <u>Hart v. Gomez</u>, 174 F.3d 1067, 1070 (9th Cir. 1999)(failure to review key documents corroborating defense witness's testimony) and citing <u>Avila v. Galaza</u>, 297 F.3d 911, 919 (9th Cir. 2002)(failure to investigate evidence that defendant's brother was the shooter); <u>Lord</u>, 184 F.3d at 1095-96 (9th Cir. 1999)(failure to call key witnesses whose testimony undermined the prosecutor's case); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1457 (9th Cir. 1994)(failure to investigate evidence that someone else was the killer).

Before trial, Allison filed an 1192.5 motion offering to enter a plea of guilty to felony robbery murder if the robbery murder special circumstance allegation was dismissed. CT 209. At trial, Allison testified and admitted he had participated in robbing Polk. RT 729-755. Thus, as Strickland expert Adelson testified, "a minimally competent defense counsel would have had to recognize that Mr. Allison's defense against the special circumstance required that he argue that Mr. Allison was merely an aider and abettor and not the shooter and; furthermore, that he lacked the intent necessary for a jury to find the special circumstance allegation true." Ex.90¶16. By any objective standard, therefore, Goldstein's failure to discover, investigate and present evidence of Bonner's admission to Hayes, Corson's opinion as to the placement of Bonner's palm print on the amplifier and the evidence that stains found on Bonner's clothes were human blood was constitutionally deficient.

The prejudice resulting from Goldstein's failure must be assessed cumulatively and in the context of all of the evidence that the jury would have heard but for Goldstein's deficient performance[5].  Because Hayes was a jailhouse informant, opposing counsel would normally have several means of impeaching him.  But Seifert's options would have been substantially limited by the fact he called Hayes to testify at Bonner's trial.  Without evidence of contact between Allison and Hayes, Seifert could not have argued that Hayes had anything to gain from testifying favorably for Allison or that Allison had given information to Hayes about Polk's murder.  Goldstein could have called Detectives Miller and Collette to testify to consistencies or inconsistencies between Hayes' testimony and his prior statements, Cal. Ev. Code 1235; 1236; and confirm that Hayes had not received any deals or been given any information.  Pet. Sum. §III.  And Seifert could not have argued Hayes' testimony had been induced or coached unless (and without) admitting he had elicited false testimony in Bonner's trial.  BRT 324-25, 333.  Thus, even if the jury had not discovered that Seifert had previously called Hayes to testify, Seifert would not have been able to avoid the effects of having done so.  Ex.90¶22.  In addition, Goldstein would have been able to use Corson's testimony and the blood evidence to corroborate Hayes' testimony that Bonner had admitted to being in the apartment and shooting Polk

Calling Hayes and Corson and presenting the evidence that human blood was found on Bonner's clothes would have allowed the defense to draw a contrast between the lack of any evidence pointing to Allison as the shooter and the three

---

[5] The prejudicial impact of Goldstein's deficient representation was even more substantial than the prejudicial impact of Seifert's misconduct because, although Hayes' testimony and the Hoover evidence provided Seifert with strong reasons to doubt the evidence he presented and inferences he propounded in Allison's trial, he had no obligation to present them as evidence.  Moreover, if Goldstein fulfilled his function in the "adversarial testing process," Strickland, 466 U.S. at 690, Seifert's misconduct would have been discovered and turned to the defense's advantage.

significant pieces of evidence pointing to Bonner as the shooter.  Pet. Sum. §I,III-V.  And if Goldstein had presented this evidence, Seifert would have had few ways to respond effectively.  Because the evidence corroborating Hayes -- including testimony by Collette and/or Miler that Hayes was not coached and received no deals -- would have come from police witnesses, Seifert would have been less able to discredit or impeach it without casting doubt on the prosecution's investigation; and because the police witnesses were adverse to Allison, the Allison jury would have had less reason than the Bonner jury to doubt them.  Moreover, there is no evidence before this court that Seifert had any basis to dispute Hoover's test results or abandon the testimony he (Seifert) elicited from Corson in Bonner's trial.  And, as this court noted in its order granting an evidentiary hearing, "the evidence [presented at trial] that [Allison] was the shooter, or that [Allison] intended Polk's death, was extremely weak."  OEH 67.  Seifert's only counter would have been to emphasize that Johnson saw Allison but not Bonner carry items out of Polk's apartment.  But, as Seifert argued in the Bonner trial, given Johnson's consistent testimony that people could have entered and left Polk's apartment without him (Johnson) seeing them and that he only saw Allison carry a TV, a duffle bag and two speakers, BRT 369-370,  Johnson's testimony would not have been sufficient to prove Bonner was not in the apartment.  Pet. Sum. §VI.

As argued above, that the jury in Bonner's trial did not find the personal use allegation true does not establish that all twelve jurors in Allison's trial would have disbelieved Hayes.  The only inference that can be drawn from the Bonner verdict is that the jury was not able to find unanimously and beyond a reasonable doubt that Bonner personally used a gun.  One or even most jurors could have still concluded, based on Hayes' testimony, it was more probable than not that Bonner did use a gun to shoot Polk; and if a single juror had come to that conclusion, then the jury's verdict is not inconsistent with a finding that there is reasonable doubt that Allison personally use a gun to kill Polk.  If Bonner and Allison had been tried

1  together, it is most likely, based on the evidence the jury would have heard in a

2  joint trial, that the jury would have been unable to arrive at a unanimous verdict as

3  to which one was the principal and which one was the aider and abettor; and, given

4  that Seifert did not have any evidence Allison intended Polk's death, the jury

5  would have not been able to find the special circumstance true as to either of them.

6         There is a substantial probability that, but for Goldstein's failure to present

7  the exculpatory evidence described above, at least one juror would have formed a

8  reasonable doubt that Allison shot Polk; and, therefore, found the personal use

9  allegation <u>not</u> true as to Allison.  The jury would have then had to determine

10  whether there was sufficient evidence to find that Allison, as an aider and abettor,

11  had the intent necessary to find the special circumstance true.  <u>Anderson</u>, 43 Cal.3d

12  at1138-1139.  Since no evidence was presented as to Allison's intent -- because the

13  state had no such evidence --, it is reasonably probable at least one juror would

14  have had reasonable doubt the special circumstance was true as to Allison; and the

15  jury could not have found Allison to be eligible for death.

16  **Claim 2(A): Trial Counsel Failed To Present Evidence To Chief Deputy**
17  **District Attorney Livesay That Would Have Caused The District Attorney's**
   **Office Not To Seek The Death Penalty**
18

19         "It has long and clearly been held that criminal defendants are entitled to

20  effective assistance of counsel during all critical stages of the criminal process."

21  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1052 (9th Cir. 2003)(citing <u>Powell v. Alabama</u>,

22  287 U.S. 45, 57, 77 (1932); <u>Brewer v. Williams</u>, 430 U.S. 387, 398 (1977).  Over

23  seventy-five years ago, the Supreme Court "recognized that the period from

24  arraignment extending to the beginning of trial is "perhaps the most critical period

25  of the proceedings."  Id. (citing <u>Powell</u>, 287 U.S. at 57).  "It is during this time that

26  a defendant may have his best opportunity for avoiding or mitigating a harsh

27  sentence by cooperating with the government."  <u>United States v. Leonti</u>, 326 F.3d

28  1111, 1116-17 (9th Cir. 2003).  The <u>Strickland</u> two-part test applies in cases where

a defendant contends that his counsel was constitutionally inadequate during the guilty plea process. Hill v. Lockhart, 474 U.S. 52, 58 (1985); Nunes, 350 F.3d at 1052-53 . "The only way to effectively repair the constitutional deprivation [a petitioner] suffered is to restore him to the position in which he would have been had the deprivation not occurred." Lewandowski v. Makel, 949 F.2d 884, 889 (6th Cir. 1991).

In 1983-84, the Los Angeles County District Attorney's office required that a written special circumstance evaluation be prepared after the preliminary hearing in all murder cases in which special circumstances were charged, and submitted to Chief Deputy District Attorney Curt Livesay, who was vested with the ultimate authority to decide whether or not to seek the death penalty. Ex. 36; Ex.28¶6. The policy also required that the decision to seek death be reevaluated if the complexion of the case changed. Ex. 36p.15; LD 110. Livesay had an "open door" policy with regard to defense attorneys in capital cases. LD 120; Ex.90¶9. He allowed them to review the special circumstance memoranda; and meet with him to dissuade him from seeking death. LD 150-51; EHvIVp49. In 1983-84, capital defense attorneys were well aware of this policy. Ex.90¶9;EHvVp192-98; LD 120. Given the life or death consequences of this process, it was clearly a critical stage in the prosecution of all capital cases in Los Angeles County at the time of Allison's trial. Trial counsel Goldstein, who had not previously tried a death penalty case, was not aware of Livesay's policies, GD 59-60, 263-65.

On February 9, 1983, Seifert completed a special circumstance memorandum recommending the death penalty for both Bonner and Allison. Ex. 60; Ex. 29; Pet. Sum. §VIII. Because he did not make himself aware of Livesay's policies, Goldstein failed to request the special circumstances memorandum or seek a meeting with Livesay to dissuade him from seeking death before Allison's trial. GD 263. As a result of his failure to obtain and review the memorandum, Goldstein did not discover that it was submitted to Livesay before the police

reported Bonner's admissions to Hayes.  LD 131-34.  Those admissions and Seifert's decision to prosecute Bonner on the theory that he shot Polk clearly changed the "complexion" of Allison's case and were the kind of information that Livesay would have expected to prompt a reevaluation.  LD 131-34.  But there is no evidence that Seifert ever prepared a reevaluation of the case for Livesay to review.  LD  93.

Only a small percentage of defense attorneys made presentations to Livesay. LD 121,152.  Some did not because they knew that cases were definitely going to be death penalty cases, LD 122; others did not because they would have had to disclose information to Livesay that the prosecutor could have then used against their client at trial.  Ex.90¶11.  But given the circumstances in Allison's case, Livesay would have expected trial counsel to meet with him and seek to persuade him not to seek death, LD 122, 147-52.  If he had been in Goldstein's shoes, he would have "sought out the decision maker and [said], 'You're about to prosecute my client Allison, and I want to point out to you the history of the case. . .'"  LD 150.  The evidence and circumstances that Livesay would have expected Goldstein to present include that Seifert had prosecuted Bonner as the killer, LD 147; there was evidence of human blood on Bonner's clothes, LD 147; Bonner had shown deception on a polygraph test, LD 147-48; and there was no evidence Allison was the shooter, LD 148.  Based on his experience and knowledge of Livesay's "practices and sense of ethics and responsibility," Strickland expert Adelson opined that information Seifert had prosecuted Bonner on the theory he shot Polk and the evidence supporting that theory -- e.g. Hayes' testimony, the Hoover report and the failed polygraph test -- "is precisely that kind of information that a minimally competent defense attorney would have known would likely have caused Mr. Livesay to instruct the trial prosecutor not to seek the death penalty in this case."  Ex.90¶12-13; EHvVp192-198.

27

1    Because Goldstein did not know that he could approach Livesay before trial,
2    he could not have made a tactical or strategic decision to not do so.  Moreover,
3    since Seifert already possessed the information Goldstein should have presented to
4    Livesay -- and none of it was inculpatory as to Allison --, Goldstein could not have
5    had a tactical or strategic reason not to present it.  GD 311-16; LD 128-135.
6    Goldstein's failure to attempt to dissuade Livesay from seeking death is
7    particularly inexplicable given that he filed a motion offering to enter a plea of
8    guilty to felony robbery murder if the special circumstance allegation was
9    dismissed,  CT 209.  Because he could have informally presented information to
10   Livesay that he might not have been able to present at trial -- e.g. the fact Seifert
11   had prosecuted Bonner as the shooter and that Bonner had shown deception on a
12   polygraph test--, Goldstein could have presented a stronger argument against death
13   to Livesay than he could present to the jury.  And Goldstein has testified that if he
14   had known he could make a presentation to Livesay, he would have done so.  GD
15   265.  For all of these reasons, Goldstein's failure to attempt to persuade Livesay to
16   reverse the decision to seek death was objectively unreasonable "considering all
17   the circumstances" and "the facts of [Allison's case] . . . as of the time" between
18   the two trials.  Strickland, 466 U. S. at 688, 690.

19        To meet prejudice prong of the Strickland test, Allison must show that there
20   is a reasonable probability that "but for counsel's unprofessional errors, the result
21   would have been different."  Id. at 694; Hill, 474 U.S. at 58.  In answer to a series
22   of leading questions from the Attorney General, Livesay testified that knowledge
23   of the failed polygraph test, the Hoover report and Hayes' statement would not
24   have necessarily changed his decision to approve the recommendation to seek
25   death.  LD 44-57.  But these answers have to be seen in the context of a former
26   prosecutor's obvious interest in not overturning a jury's verdict long after the fact.
27   Following Strickland, the correct test is whether, given the available information
28   and the decision-making context in the period between the Bonner and Allison

trials, a presentation by Goldstein between the two trials would have changed Livesay's understanding of the case and caused him to prevent Seifert from seeking the death penalty in Allison's trial.  Livesay's policy at the time was that, seeking death was only "appropriate" if "the evidence bearing on the issue is of such convincing force that a reasonable and objective fact finder, after considering all the relevant evidence, would conclude that the aggravating circumstances outweigh the mitigating circumstances." Ex. 36; LD 112-16.  In applying this standard, Livesay tried to err on the side of the defendant.  LD 116.  And he sought to maintain a high ethical standard in his office, LD 97.

In deciding Allison's case, Livesay would have considered it important that there was no direct evidence that Allison was the shooter, LD 148, that Bonner had shown deception on a polygraph test, LD 83, EHvVp207-08; that blood stains were found on Bonner's clothes, LD 85, that Hayes had testified that Bonner admitted to shooting Polk, LD 131-32, and that Seifert had prosecuted Bonner on the theory that he shot Polk, LD 147.  If Goldstein had not been deficient in failing to conduct a mitigation investigation, he would have also been able to present Livesay with the powerful mitigating evidence of Allison's childhood exposure to violence and abuse, Pet. Sum. §X, which Livesay would have then weighed against the very weak evidence that Allison was personally responsible for Polk's execution-style murder.

After being presented with this information, it is reasonably probable that he would have required Seifert to defend his decision to seek the death penalty against Allison, Ex.28¶11; LD 158-60,163.  Had Livesay done so, Seifert would have had to admit to him that he knew of no evidence directly pointing to Allison as the shooter, that he had presented testimony by Detective Corson to establish that Bonner's print was placed on the amplifier while he was carrying it out of the apartment, and that he planned to argue that there was no evidence Bonner was in Polk's apartment even though he knew there was evidence Bonner was in the

1  apartment. Pet. Sum. §III-VII.  Seifert would have also had to acknowledge that he

2  was going to present a factual theory that irreconcilably contradicted the factual

3  theory he presented at Bonner's trial even though he had obtained no new evidence

4  to support this flip-flop.

5       In reevaluating the case, it is reasonably probable that Livesay would have

6  found the evidence Allison was the shooter, or that he intended Polk's death, was

7  extremely weak, LD 170; Pet. Sum. §I -- and, therefore, that the evidence to

8  support the only aggravator -- an "execution style" shooting -- was <u>not</u> "of such

9  convincing force that a reasonable and objective fact finder, after considering all

10 the relevant evidence, would conclude that the aggravating circumstances

11 outweigh the mitigating circumstances" -- and consistent with his policies in 1983-

12 84, Livesay would have reversed his approval of Seifert's recommendation to seek

13 death.

14      Given Livesay's commitment to maintaining a high ethical standard in his

15 office, LD 97, it is also reasonably probable that his decision would have been

16 affected by the discovery that Seifert intended to prevent Allison's jury from

17 hearing evidence Seifert had presented to Bonner's jury and argue that there was

18 no logical, reasonable or truthful basis for factual inferences Seifert had strongly

19 propounded in Bonner's trial.  See Infra..  If, as is reasonably probable, Livesay

20 had refused to allow Seifert to prosecute Allison based on evidence and inferences

21 that irreconcilably contradicted evidence and inferences he presented in Bonner's

22 trial, Seifert's ability to persuade the jury that Allison was morally culpable not

23 only for Polk's murder but also for the aggravated nature of his murder would have

24 been severely limited.  Even if Livesay had decided to allow Seifert to seek death,

25 Seifert would have been constrained at trial in ways that would have made it more

26 difficult for him to persuade the jury that Allison shot Polk -- or that he intended

27 his death.  For these reasons, it is reasonably probable that, but for Goldstein's

28

30

objectively unreasonable failure to present the information above to Livesay, the outcome of the proceedings against Allison would have been different.

**Claim 2(A): Trial Counsel Failed To Investigate and Present Mitigating Evidence In The Penalty Phase of Allison's Trial**

In 1978 the Supreme Court clearly established that a sentencer may not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record.  Lockett v. Ohio, 438 U.S. 586, 604 (1978).  At the time of Allison's trial, "[e]vidence of a difficult family history and of emotional disturbance was typically introduced by defendants in mitigation.  Eddings v. Oklahoma, 455 U.S. 104, 115 (1982)(citing McGautha v. California, 402 U.S. 183, 187-188 (1971));  see e.g. People v. Ramos, 30 Cal.3d 553, 564-65 (Cal.1982)(defense presented considerable background information concerning appellant's childhood).  Evidence of a troubled or abusive childhood need not bear any link or nexus to the crime of conviction in order to be relevant mitigating evidence.  Smith v. Texas, 543 U.S. 37, 45 (2004).  The duty to investigate imposed by Strickland, therefore, necessarily includes the duty to make a "diligent investigation into [a] client's troubling background and unique personal circumstances."  Summerlin v. Schriro, 427 F.3d 623, 630 (9th Cir. 2005); see also Belmontes v. Ayers, 529 F.3d 834, 857-58 (9th Cir. 2008); Correll v. Ryan, 539 F.3d 938,943 (9th Cir. 2008).  A decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to his making an informed decision. See Lambright v. Schriro, 490 F.3d  at 1116)(citing Wiggins, 539 U.S. at 522-23). To fulfill his duty to investigate, counsel must sufficiently investigate and prepare to be able to present and explain the significance of all the available mitigating evidence. See Allen v. Woodford, 395 F.3d 979, 1000 (9th Cir. 2005)(citing Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir.2001).

In Allison's case, Goldstein was deficient in the penalty phase of the trial both in failing to present evidence that Allison was not the shooter, which would have mitigated the only aggravator Seifert presented to the jury, and by failing to present substantial mitigating evidence, including testimony by lay witnesses and experts, of Allison's childhood exposure to violence and abuse.  Goldstein's deficiency in failing to present exculpatory evidence in the guilt phase necessarily amounted to a deficiency in the penalty phase of Allison's trial.  By failing to create reasonable doubt as to whether Allison shot Polk, Goldstein allowed Seifert to argue, based on the jury's guilt phase verdict, that they had already decided Allison was responsible for the "execution-style" murder.  RT 959, 963.  This failure was compounded by Goldstein's failure to present exculpatory evidence in the penalty phase that Bonner had shown deception on a police polygraph test Pet. Sum. §VII.  Goldstein could have introduced this evidence in the penalty phase to rebut Seifert's argument that only Allison could have carried out the execution-style shooting.  See Mak v. Blodgett, 970 F.2d 614,623 (9th Cir. 1992)(in painting defendant as ringleader, prosecutor made the issue of defendant's role in the offense relevant) .  At the time of Allison's trial, training materials available to capital defense attorneys in California publicized the fact that, based on recent Supreme Court precedents including Lockett, Eddings and Green, polygraph evidence was admissible in the penalty phase.  Ex. 223.  The Ninth Circuit approved this position in Rupe v. Wood, 93 F.3d 1434, 1441 (1996)(holding that, based on the constitutional standards established by Lockett, 438 U.S. at 604 and Eddings, 455 U.S. at 113-14, the results of a polygraph test were admissible in the penalty phase of a trial to show that a defendant "did not play as great a role in the offense as the prosecution would like the jury to believe." 93 F.3d 1434, 1441 (1996).  At the time of Allison's trial, therefore, Goldstein could and should have sought to admit the results of Bonner's polygraph.

In <u>United States v. Scheffer</u>, 523 U.S. 303, 309 (1998), the Supreme Court rejected a defendant's claim that exclusion of testimony that the results of a polygraph test were "inconclusive" did not violate due process because the defendant "never offered evidence the test was reliable."  Based on the testimony of Dr. Charles Honts, Allison has established that the polygraph tests have gained general acceptance in the scientific fields of psychology and psychophysiology and that "high quality scientific research" has established their reliability.  Ex.51. Honts' testimony also established that  "a polygraph test conducted in November 1982 by a qualified polygrapher under proper conditions would have provided valid and reliable results as to whether or not a suspect showed deception in answering," Exs. 51,78.  And the state's own witnesses agreed that Dr. Honts is a leading expert on the reliability of polygraphs and that Michael Pella, who administered the test, was a qualified and trustworthy polygrapher.  Pet. Sum. §VII.  For these reasons, Goldstein's failure to even attempt to introduce the results of Bonner's polygraph was objectively unreasonable at the time of Allison's trial. Ex.90¶¶26-27; Ex. 223.

Goldstein's failure to present mitigating evidence is even more egregious. There is no evidence he took a single intentional step to investigate possible sources of mitigation.  In the year before the trial began, he met with Allison outside of court five times for a total of five-and-one-half hours -- all but one of the meetings coincided with a court appearance -- and the longest single meeting occurred merely three weeks before the beginning of trial.  Ex. 112.  Goldstein has no memory of these meetings; and there is no evidence that he used any of them to elicit information to help him prepare a penalty phase defense.  Pet. Sum. §IX. Goldstein did review a long statement Allison wrote, but that statement consisted almost entirely of a description of Allison's activities in the months leading up to his arrest; and Goldstein did nothing to pursue the possible leads it contained -- e.g. the separation of Allison's parents and the violent death of one of Allison's friends.

Pet. Sum. §IX.  Before trial Goldstein remembers meeting with Allison's mother, Stella Davis, but his billing records do not include any documentation of such a meeting, and she testified that the only time she met with him was in court.  Pet. Sum. §IX.

Six months before trial, Goldstein retained Dr. James Freeman., a psychologist with no prior capital experience and no knowledge of the kinds of evidence that could be offered as mitigation, Ex. 232.  Goldstein has absolutely no memory of Freeman, GD 70, 75, 79, 173, 175, or the reports he prepared, 90, 180-181.  There is no evidence that Freeman's report were related to penalty phase preparations; or that they had any influence on Goldstein's penalty phase strategy.  Pet. Sum. §IX.

A week before the trial, Goldstein retained Dr. Michael Maloney.  Neither Goldstein nor Maloney have any memory of why Goldstein asked Maloney to assess Allison, GD 68, MD 11; and neither remembers speaking to the other about the case, GD 68,77.  Because he was hired on the eve of trial, both Maloney and his assistant, Dr. Nancy Kaser-Boyd, are certain that he was not retained to do mitigation work for possible presentation in the penalty phase.  Pet. Sum. §IX.  Goldstein did not receive Maloney's report until the day that Allison was sentenced to death, GD 91-92, 277-79; and, therefore, it could not have formed a basis for his decisions before or during the trial.

The limited amount of information that Goldstein did obtain should have prompted him to investigate Allison's family background.  For example, in his first interview with Allison, Goldstein learned that Allison's father had left the home when Allison was very young and that he was "somewhere in Los Angeles." Ex.111. But Goldstein did not even bother to follow up to determine if Dave Allison was alive, GD 287-88.  If he had followed up, he would have discovered that Dave and Stella had very conflicting accounts of why they separated, and, regardless of which account was closest to the truth, Allison's early childhood had

been very traumatic.  Pet. Sum. §X.  A limited search of public records would have

also yielded inklings of Allison's traumatic early life.  For example, if Goldstein

had reviewed newspaper clippings, he would have discovered that Allison's uncle

had been killed by police after he shot his wife, Ex.209; and if he had investigated

further he would have discovered that Allison had witnessed these shootings when

he was seven years old.  Pet. Sum. §X.  If Goldstein had reviewed police records,

he would have discovered that Allison's step-father had been arrested several times

for drunk driving and that Allison's uncles and cousins had serious criminal

records.  Pet. Sum. §X.  In addition, even though most of Allison's closest family

members -- including his sisters and the cousins he had been in constant contact

with during his early years -- lived in Long Beach, there is no evidence that

Goldstein attempted to interview any of them.  If he had, he would have discovered

that Allison had been exposed to substantial violence and abuse throughout his

childhood.  Pet. Sum. §X.

By the time of Allison's trial, it was a standard practice for capital defense

attorneys to investigate a client's family background and life history.  Ex.90¶32;

EHvVp208-11.  Capital defense training materials and seminars available in 1983-

84 emphasized the importance of understanding the factors that shaped a

defendant's mental, physical and social development and functioning and

discovering evidence that could be presented in mitigation at the penalty phase of

trial.  Ex.90¶¶32-34; Exs. 224, 225, 226.  Thus, Goldstein's failure to conduct a

mitigation investigation and prepare a family or social history fell below the

minimum professional standard for a capital defense attorney practicing in Los

Angeles County in 1984.  Ex.90¶¶31-39.

Goldstein does not appear to have sought any significant background

information from Allison or his mother, the only two family members Goldstein

had any contact with.  Pet. Sum. §IX.  But even if he had, it would have been

deficient for him to limit his investigation to interviewing them.  Ex.90¶35.  As the

testimony of Stella and Allison's sister, Tina, revealed, Allison's immediate family was very reluctant to reveal their troubled history.  EHvVp116,126-27; .  And, because of his complicated relationship with his mother and, most probably, the emotional constriction caused by his traumatic childhood experiences, eliciting information from Allison required expertise and sensitivities that Goldstein lacked. EHvVIp63-4,104-106; Ex. 226.  Goldstein compounded his deficiency by first retaining a psychologist who had no death penalty experience or understanding of mitigation; and then retaining a competent psychologist, but at a point in time when it was too late for him to conduct a minimally competent mitigation investigation, Pet. Sum. §IX.

When the guilt phase ended, Goldstein was totally unprepared to present a penalty phase defense.  On the morning that the jury returned the guilty verdict, Goldstein called Stella at work and asked her to come down to the courthouse to testify that afternoon.  He did not prepare her to testify and her brief testimony provided the jury with no insight into who Allison's troubled life.  Pet. Sum. §IX. Given that Stella was responsible, in part, for many of much of the chaos and trauma Allison was exposed to as a child, EHvVIpp52-53, Goldstein's decision to only call her merely confirmed that he had not conducted any real investigation into Allison's family history.  "duty to discuss . . . the purpose of [her] testimony, reveal the type of questions he planned to ask [her] on the stand, and instruct [her] as to what kind of information the jury would find helpful and what kind of testimony would not be relevant."  Belmontes, 529 F.3d at 861.

If Goldstein had conducted even the most minimally competent investigation he would have been able to present a powerful mitigation argument -- and, given the weakness of the evidence that Allison was the shooter, the mitigation that Goldstein could have presented would have substantially outweighed the circumstances of the crime.  As Allison's cousins -- George Webb, Annette Webb Long and Zenna Webb Morris -- testified, they were living in Long Beach at the

time of Allison's trial and, if interviewed, would have told Goldstein about Allison's traumatic childhood and they would have testified as they testified in the evidentiary hearing in this proceeding.  Exs. 229, 230, 231.  In addition, if Goldstein had conducted a minimally competent mitigation investigation, he would have uncovered the details of Allison's social history that are documented in the declaration of Dr. Mindy Rosenberg and which she confirmed in live testimony before this court.  Ex. 206.  And if Goldstein had prepared such a social history and provided it to Dr. Maloney or his assistant, Dr. Kaser-Boyd , they would have been able to recognize the inklings of Allison's traumatic childhood suggested by their limited testing.  Exs. 207, 248.

If Goldstein had investigated Allison's family and social history and provided that information to Maloney, he would have been able to explain what at least some of the jurors must have found to be the most troubling part of Allison's testimony:  His testimony that he carried property out of Polk's apartment as Polk lay dead or dying on the floor.  Paradoxically, the only glimpse of exposure to violence and traumatic events that the jury got in the entire trial was when Seifert asked, "And it wasn't such a shock to see the man down and injured that you would say, "hey, I didn't want this.  I'm going to quit now."  And Allison answered, "I see people down and injured every day."  RT 780.  That answer should have been the opening of Goldstein's penalty phase argument.  Instead, because Goldstein never recognized its significance, it was left unexplained.  For all of these reasons, had the jury been able to see Allison's actions in context and place his "excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a difference balance."  Wiggins, 539 U.S. 510,522.

**Claim 31: Ineffective Assistance of Appellate Counsel**

The Strickland standard applies to appellate counsel.  See Pollard v. White, 119 F.3d 1430, 1435 (9th Cir. 1997).  But the two prongs of Strickland -- whether

1   counsel's performance was objectively unreasonable and whether there is a

2   reasonable probability that, but for his counsel's unreasonable failure, he would

3   have prevailed on appeal -- are often intertwined.  See <u>Miller v. Keeney</u>, 882 F.2d

4   1428, 1434-35 (9th Cir. 1989).  This is clearly true in Allison's case.

5          Allison's state appointed appellate/habeas counsel filed a state habeas claim

6   alleging that the prosecution's presentation of conflicting theories at the separate

7   trials of Bonner and Allison violated Due Process, but they failed to file this claim

8   on appeal.  Ex. 91.  Because Allison's record on appeal had been augmented to

9   include the transcript of the Bonner proceedings, the California Supreme Court

10  defaulted Allison's state habeas claim on the ground that it should have been raised

11  on direct appeal.  Allison maintains that, as the California Supreme Court held in

12  <u>Sakarias</u>, this claim is properly raised on habeas.  Ex. 93.  As the evidentiary

13  hearing in this case demonstrated, evaluating a prosecutor's decision to present

14  conflicting positions in two trials necessarily requires inquiry into facts outside of

15  the trial record.  However, as Strickland expert Cliff Gardner's declaration

16  establishes, when there is a question as to whether a claim should be raised on

17  appeal or habeas, it is objectively unreasonable for appellate counsel to fail to raise

18  it on appeal as well as in state habeas.  Ex. 93.  In this case, appellate counsel had

19  no tactical or strategic reason not to raise the issue on appeal and would have done

20  so if they had realized they could.  Ex. 91.  Paradoxically, therefore, if Allison was

21  required to raise this claim on appeal, then his appellate counsel's failure to do so

22  was constitutionally deficient; and if, as a result of his appellate counsel's failure to

23  do so, he defaulted a claim that would have otherwise been successful, then it was

24  prejudicial.  Thus, both prongs of the Strickland test would be satisfied.

25  **CLAIM V.  ACTUAL INNOCENCE**

26         Allison agrees, as this court held its order granting an evidentiary hearing,

27  his actual innocence claim hinges on a finding that "in light of new evidence, 'it is

28  more likely than not that no reasonable juror would have found" the special

circumstance true.  OEH at 102-03 (citing <u>House v. Bell</u>, 547 U.S. 518, 537-538 (2006)(quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).  To find the special circumstance true, a juror would have had to find either that Allison was the shooter or that he intended Polk's death.  <u>Anderson</u>, 43 Cal.3d at 1138-39. "<u>Schlup</u> makes plain that the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial."  <u>House</u>, 547 at 538 (quoting <u>Schlup</u> at 327-328, Based on the "new" and "old" evidence presented in this proceeding  -- Bonner's admission to Hayes that he shot Polk, Pet. Sum. §III, the human blood on Bonner's clothes, Pet. Sum. §IV, the results of Bonner's polygraph test, Pet. Sum. §VII, Corson's testimony regarding the placement of Bonner's palm print on the amplifier, Pet. Sum. §V, and the gaps in the ability of the eyewitnesses to observe someone going in and out of Polk's apartment -- and the fact that there is no direct evidence that Allison shot Polk or intended his death, Pet. Sum. §I, Allison submits that he has proffered sufficient evidence to pass through the <u>Schlup</u> gateway.

## CLAIM 11 paragraph 12:     SUFFICIENCY OF THE EVIDENCEOF AGGRAVATION

Because, as argued throughout this brief, the evidence that Allison shot Polk is, at best, very weak, Allison submits that the evidence presented at trial was insufficient to support a finding that he was responsible for aggravated, "execution style" of Polk's murder.  In this regard, it is especially significant that, after being presented with all of the evidence before this court, at the end of his deposition, former Chief Deputy District Attorney Livesay testified "I'm still not convinced that he [Allison] was the personal shooter . . .," LD 170; and that Prosecutor Seifert testified that he did not "recall any direct evidence" that Allison was the shooter, SD 179.  Therefore, Allison submits that the evidence was legally insufficient to

39

support the jury's finding that the aggravating factors outweighed the mitigating factors and his death sentence must be set aside.

Moreover, in light of Prosecutor Seifert's testimony that Polk's murder was "run-of-the mill" in terms of the "many" execution style murders he had tried, SD 177, Allison requests that this court reconsider its ruling that the murder was a "crime more offensive than any other murder of the same general character" under People v. Davenport, 41 Cal 3d. 247, 289 (1985).

**CLAIM 15:        INCONSISTENT JURY VERDICT**

In both Allison's and Bonner's trials, the jury found the principal armed allegation not true. This finding is obviously inconsistent with the finding that Allison personally used a handgun and the evidence that Polk was shot. Twenty-five years after the fact, it is impossible to determine the logic or jury room deliberations and compromises that led the Allison jury to reach an inconsistent verdict. Rather than constituting a separate claim, Allison maintains that these results must be interpreted as evidence that either the jury did not properly understand the instructions it received or it was conflicted and that the conflict led it to an illogical and inexplicable outcome. Either interpretation provides a substantial basis to doubt the reliability of the verdict in Allison's case, especially since the matter on which the jury was confused related directly to the material issue at the heart of all of Allison's claims..

**CONCLUSION**

For all of these reasons, Allison requests that this court grant the relief requested above.

DATED:  May, 26, 2009

Respectfully Submitted,

_____/s/_____
MICHAEL CLOUGH
ATTORNEY FOR PETITIONER

40